**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

HI-5 ABA, INC.,
HI-5 ABA PROCESSING, INC., and
ABC BEHAVIOR, a division of
CORNERSTONE MISSIONS, INC.

      Plaintiffs,

      v.                              Case No.: 1:25-cv-01157-LMB-WEF

EDUCATIONAL & BEHAVIORAL
SUPPORT SERVICES, LLC, and
KEITH BELTON,

      Defendants.

                                     /

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c) OR, IN THE ALTERNATIVE, CROSS-MOTION FOR LEAVE TO AMEND THE COMPLAINT

**I.      INTRODUCTION**

In their motion for judgment on the pleadings, the defendants argue that all of the plaintiffs' claims are barred by a provision in the agreement between defendants and plaintiff Hi-5 ABA, Inc. ("Hi-5 ABA") that obligates the parties to that agreement to bring claims against the other "within one (1) year from the occurrence of the facts giving rise to such claims." ECF No. 36-1 at 1. But the defendants miss the mark. First and foremost, that provision does not apply to the claims asserted by plaintiffs Hi-5 ABA Processing, Inc. ("Hi-5 Processing") and ABC Behavior ("ABC")[1] under their separate contracts with the defendants that do not include such a provision. Moreover, the defendants' argument presupposes an accrual date for Hi-5 ABA's claims that is not accurate, based on both the language of the parties' agreements and governing

---

[1] Hi-5 ABA, Hi-5 Processing, and ABC are collectively referred to as the "Hi-5 Parties."

law. Indeed, the franchise agreement between the defendants and Hi-5 ABA (the "Franchise Agreement") expressly provides for deferral of payment of royalties due under that agreement for one year after they are earned, due to the nature of the manner and timing in which the defendants actually received revenues from insurance providers on which those royalties were due to be paid. The Complaint references this provision, alleging that the defendants agreed to pay royalties on "billings that were collected many months after a client or insurance provided was billed for the services [the defendants] rendered." ECF No. 1 ¶ 16.

As a result, there is a material dispute of fact as to the due date for amounts the defendants owed to Hi-5 ABA and thus, when a claim for recovery of those amounts accrued for purposes of the contractual limitations period. In addition, under Virginia law, each time the defendants failed to make a payment under the Franchise Agreement that was due after deferral, a new claim accrued for that nonpayment, triggering the start of a new limitations period for that nonpayment. Accordingly, even if Hi-5 ABA's claims as to some amounts might be barred by the contractual limitations period (which they are not), there is a material dispute as to whether Hi-5 ABA has valid claims for payments that accrued within the one (1) year period, particularly given the deferral of payment, the timing of collection, and the fact that the parties agreement did not expire until the end of October 2024.

The defendants' motion should be denied. Alternatively, the Hi-5 Parties move for leave from the Court to amend their complaint under Rule 15(a) to allege additional facts in response to the defendants' affirmative defense regarding the contractual limitations period.

## II.    FACTUAL BACKGROUND

### A.    The Parties' Agreements and Relevant Provisions

Defendants Educational & Behavioral Support Services, LLC ("EBSS") and Keith Belton operated a franchised HI-5 ABA behavioral therapy business (the "Franchised Business") in

California under a license from Hi-5 ABA, the franchisor of the HI-5 ABA behavioral therapy business system. ECF No. 1-1, at 1. Under the Franchise Agreement, EBSS agreed to pay Hi-5 ABA a royalty fee equal to eight percent (8%) of EBSS's gross revenues. ECF No. 1 ¶ 16; ECF No. 1-2 § 4.2. Concurrent with EBSS's execution of the Franchise Agreement, EBSS entered into a franchisee services agreement (the "Services Agreement") with Hi-5 ABA's affiliate, Hi-5 Processing, governing the provision of specified administrative processing, billing, collection, and accounting services to EBSS by Hi-5 Processing to facilitate EBSS's operation of the Franchised Business. ECF No. 1-1 ¶ 12 & Ex. 2 (ECF No. 1-3). Under the Services Agreement, EBSS agreed to pay Hi-5 Processing a billing fee equal to six percent (6%) of EBSS's gross revenues and an administrative support fee equal to five percent (5%) of EBSS's gross revenues. ECF No. 1-1 ¶ 12; ECF No. 1-3 § 3. EBSS also entered into a clinical consultation agreement (the "Consultation Agreement") with ABC governing the provision of clinical consulting services to EBSS by ABC to facilitate EBSS's operation of the Franchised Business. ECF No. 1-1 ¶ 13 & Ex. 3 (ECF No. 1-4).[2] Under the Consultation Agreement, EBSS agreed to pay ABC one percent (1%) of gross revenues for clinical consulting services that ABC's consultants provided to EBSS. ECF No. 1-1 ¶ 18; ECF No. 1-4 § 8.[3]

As alleged in the Complaint, EBSS agreed to pay fees due to the Hi-5 Parties on "revenues from billings that were collected many months after a client or insurance provide[rs] was billed for the services EBSS rendered." ECF No. 1 ¶¶ 16-18. As a result, under the terms of

---

[2] The Franchise Agreement, the Services Agreement, and the Consultation Agreement are referred to collectively as the "Hi-5 Agreements."

[3] Under Section 4.5 of the Franchise Agreement, EBSS agreed that Hi-5 ABA had the right to collect fees due to Hi-5 Processing and ABC on their behalf. ECF No. 1-2 § 4.5. However, that section makes clear that Hi-5 ABA's collection of any amounts that EBSS owed to Hi-5 ABA's affiliates did not render those amounts sums owed to Hi-5 ABA. *Id.* § 4.5.1.1.

the Franchise Agreement, each month, Hi-5 ABA would calculate the "Required Payments"[4] and "Support Services Fees" (i.e., the fees due under Hi-5 Agreements) based on EBSS's "Gross Revenues"—which was defined to only include amounts collected by EBSS—for the prior month. ECF No. 1-2 §§ 4.4.7, 4.5.1.1. Hi-5 ABA would use payments collected from clients or insurance providers to pay royalty fees due under the Franchise Agreement "subject to any amounts that we elect to be Deferred Royalty Fees." *Id.* § 4.5.1.1. The Agreement defines "Deferred Royalty Fees" as:

> any Royalties that are due and payable to us under this Agreement, but for which we elect to defer collection for a period of time in order to allow you to receive advances from us or [Hi-5 Processing] against future collection of existing receivables of your Franchised Business. Unless approved in writing by us, <u>Deferred Royalties will be due and payable in full within a maximum of one year of the date the Royalties were earned</u> . . . .

*Id.* § 4.4.6 (emphasis added). The Franchise Agreement also permits Hi-5 ABA to use payments collected to pay amounts due to Hi-5 ABA or its affiliates as "Advances," which are defined as monies that Hi-5 ABA or its affiliates loan or otherwise advance to EBSS as advances against EBSS's receivables. *Id.* §§ 4.4.2, 4.5.1.1. Importantly, the Franchise Agreement specifies that royalty fees were "due when you have generated <u>and received</u> Gross Revenues." *Id.* § 4.6.1 (emphasis added). The Franchise Agreement also required Hi-5 ABA to afford EBSS thirty days following receipt of a default notice to cure a payment default under the Franchise Agreement to avoid termination of that Agreement. *Id.* § 17.3.

Similar to the Franchise Agreement, under the Services Agreement, Hi-5 Processing and EBSS agreed that the fees due under that agreement "are contingent upon collection of [gross] revenues . . . .If [Hi-5 Processing] processes claims on [EBSS's] behalf which go unpaid . . . ,

---

[4] Capitalized terms not defined herein have the meaning ascribed to them in the Hi-5 Agreements.

[Hi-5 Processing] shall not earn its Billing Fee or Administrative Fee." ECF No. 1-3 § 3.

Additionally, the Services Agreement set forth the policy for advancement of funds to EBSS:

> [Hi-5 Processing]'s general operating policy is to advance funds to meet Franchisee obligations and expenses when Franchisee revenues are insufficient; particularly with respect to Franchisee payroll and other direct expenditures disbursed by [Hi-5 Processing] on Franchisee's behalf. Advances are secured by all outstanding receivables of Franchisee. The current standard amount available for advances is 75% of the gross outstanding qualifying unpaid claims resulting from services performed by Franchisee up to the end of the pay-period for which advances are made. Qualified claims are those which are: (a) submitted claims supported by proper documentation, (b) less than 90 days old as of the first day of the current calendar month, and (c) not subject to any substantial detrimental condition of payor's policy or practice which might reasonably jeopardize payment. Any such advances are in the sole and absolute discretion of [Hi-5 Processing].

*Id.* § 18. Like the royalties due under the Franchise Agreement, the Services Agreement provided for deferral of payment of advances and fees due under the Services Agreement (and the Franchise Agreement):

> Vendors which provide services to [EBSS], including [Hi-5 Processing] and [Hi-5 ABA], may participate in providing [EBSS] advances as defined above by authorizing deferral of fees earned against future collection of existing receivables. Unless expressly authorized by a vendor in writing, such total deferrals shall: (a) not exceed the amounts set forth above, (b) <u>be payable by [EBSS] within a maximum of one year of the date earned</u>, and (c) remain the liability of [EBSS] regardless of whether collateral receivables are collected. [Hi-5 ABA] hereby authorizes [Hi-5 Processing] to defer any and all payments due to [Hi-5 ABA] under the Franchise Agreement consistent within the scope of the advance policy set forth in this agreement. The purpose of this paragraph is to allow [Hi-5 ABA] and [Hi-5 Processing] to allocate up to 100% of funds advanced to [EBSS] against receivables due to [Hi-5 ABA] and [Hi-5 Processing] . . . .

*Id.* § 20 (emphasis added). Finally, the Services Agreement provides that a default of the Franchise Agreement is a default of the Services Agreement and that, in the event of a default,

EBSS would repay Hi-5 Processing the balance of any remaining advances within thirty (30) days of notice of the default. *Id.* § 26.

At the same time EBSS executed the Hi-5 Agreements, Belton executed a Guarantee, Indemnification, and Acknowledgment (the "Guarantee"), pursuant to which Belton jointly and severally agreed to make all payments required of EBSS under the Franchise Agreement, as well as under the Services and Consultation Agreements. ECF No. 1-1 ¶ 14 & Ex. 4 (ECF No. 1-5).[5]

Section 27 of the Franchise Agreement contains the provisions relating to applicable law and dispute resolution. Under Section 27.7, Hi-5 ABA and EBSS agreed to the following:

> Any and all claims and actions arising out of or relating to this Agreement, the parties' relationship, or your operation of the Franchised Business, <u>brought by any party hereto against the other</u>, must be commenced within one (1) year <u>from the occurrence of the facts giving rise to such claim or action</u>, or such claim or action will be barred; provided, however, that the parties agree that this Section 27.7 will not apply to a claim by either party seeking indemnification under this Agreement.

ECF No. 1-2 § 27.7 (emphasis added). In the Franchise Agreement, Hi-5 ABA and EBSS also agreed that "nothing in this Agreement is intended, nor will be deemed, to confer upon any person or Entity other than [EBSS], [Hi-5 ABA], and [their respective successors and assigns], any rights or remedies under or by reason of this Agreement." *Id.* § 26.3.

In contrast, the Services Agreement entered between Hi-5 Processing and EBSS does not include a provision similar to Section 27.7 of the Franchise Agreement. *See* ECF No. 1-3. Hi-5 Processing and EBSS did agree in the Services Agreement that EBSS's "obligations under the Franchise Agreement are incorporated herein by reference" but did not agree that Hi-5

---

[5] As alleged in the complaint, the Guarantee obligated Belton to make payments due under the Franchise Agreement. ECF No. 1-1 ¶ 14. The Guarantee expressly specifies that Belton guaranteed "all of [EBSS's] monetary obligations under the [Franchise] Agreement, as well as any other contract between [EBSS] and [Hi-5 ABA] (and/or [Hi-5 ABA's] affiliates, will be punctually paid and performed." ECF No. 1-5, at 2.

Processing was similarly bound by any of Hi-5 ABA's obligations under the Franchise Agreement. *Id.* at § 24. In that regard, the integration clause of the Services Agreement provides that "[t]his document, together with applicable portions of the Franchise Agreement, constitutes the entirety of the agreement between the parties . . . ." *Id.* § 27. The Consultation Agreement likewise does not include any provision regarding mediation and contains an integration clause similar to that included in the Services Agreement. ECF No. 1-4 § 13. Moreover, both the Services and Consultation Agreements contain a choice of law provision (ECF No. 1-3 § 28; ECF No. 1-4 § 14), and the Services Agreement addresses the award of attorneys' fees in any dispute (ECF No. 1-2 § 27.9), both of which Section 27 of the Franchise Agreement also address.[6]

By their terms, the Hi-5 Agreements all expired on October 29, 2024 (the "Expiration Date"). ECF No. 1 ¶ 25. Under the terms of the Franchise Agreement, upon expiration or termination of that Agreement, EBSS was obligated to "promptly pay all sums owing to [Hi-5 ABA] and our subsidiaries and affiliates." ECF No. 1-2 § 18.5.

### B.    The Parties' Dispute about Fees

As alleged in the complaint, in May 2024,[7] EBSS "cut off Hi-5 Processing's access to the Designated Accounts and, as a result, did not provide Hi-5 Processing with data regarding its Gross Revenues, billings, or collections." ECF No. 1 ¶ 21. As a result of that action, Hi-5

---

[6] If Section 27 were an "applicable portion" of the Franchise Agreement, these provisions in the Processing and Consultation Agreements would be superfluous. Nor does any other provision of the Services or Consultation Agreement suggest that Section 27.7 of the Franchise Agreement applies to, or was incorporated into, those separate agreements.

[7] The Hi-5 Parties have subsequently determined that this allegation actually states the incorrect date. As alleged in the proposed First Amended Complaint attached as Exhibit A, EBSS actually cut off Hi-5 Processing's access in June 2024, after Hi-5 Processing withdrew amounts from EBSS's bank accounts in June 2024. Exhibit A ¶ 33. This fact is further evidenced by the statement attached to the June 13, 2025 letter from Hi-5 ABA's counsel to EBSS's former counsel, which reflects those withdrawals. *See* ECF No. 18-4 at 9.

Processing had no ability to assess what amounts EBSS had collected on prior or current billings or to collect amounts owed to the Hi-5 Parties. By letter dated July 16, 2024 (the "Default Notice"), Hi-5 ABA notified EBSS that it was in default of the Hi-5 Agreements for failing to use Hi-5 Processing's centralized billing platform and blocking Hi-5 Processing from accessing EBSS's records or bank accounts to confirm billings and collections. ECF No. 1-6. As a result of that lack of access, the Hi-5 Parties advised that they also were unable to collect their share of payments made to EBSS. Hi-5 ABA indicated that, as of June 30, 2024, EBSS owed Hi-5 ABA, Hi-5 Processing, and ABC $48,127.06 in previously deferred fees under the three Hi-5 Agreements and was estimated to owe an additional $14,994.83 in fees based on unknown collections made in June 2024. ECF No. 1 ¶ 27; ECF No. 1-6. Hi-5 ABA demanded (on behalf of itself and its affiliates) that EBSS return to using the centralized billing system and restore Hi-5 Processing's access to EBSS's accounts and records. *Id.* Hi-5 ABA also demanded that EBSS and Belton pay the amounts owed to cure its defaults. *Id.* Although the Notice of Default demanded EBSS cure immediately, under the Franchise Agreement, EBSS had thirty days to cure its default, or until August 15, 2024.[8] *See* ECF No. 1-2 § 17.3; ECF No. 1-3 § 26.

In response to the Notice of Default, EBSS resumed use of the centralized billing and collection system but did not restore Hi-5 Processing's access to EBSS's bank account by August 15, 2024. ECF No. 1 ¶ 24. EBSS also failed to pay the amounts Hi-5 ABA had indicated were due in the Notice of Default by that date because EBSS disputed the amount Hi-5 ABA claimed was owed. *Id.*[9]

---

[8] Under the California Francise Relationship Act, which arguably would have applied to the parties' relationship due to EBSS's and Belton's business operating in California, EBSS and Belton would have had sixty days to cure their default. *See* Cal. Bus. & Prof. Code § 20020.

[9] Although not alleged in the Complaint, beginning in June (and throughout July and August before and after Hi-5 ABA sent the notice of default), EBSS and Belton indicated that they were

Following expiration of the Hi-5 Agreements on October 28, 2024, Hi-5 ABA sent EBSS and Belton a letter on November 25, 2024, demanding that they pay all amounts due as of the expiration date, which at that point Hi-5 ABA calculated to exceed $96,000. ECF No. 1-7. That letter noted that "[p]rior to the Expiration Date, [EBSS] and Hi-5 ABA had worked to reconcile amount owed to Hi-5 ABA and its affiliates under the Hi-5 Agreements, in anticipation of the Expiration Date and Franchisee's stated desire not to renew those Agreements." *Id.* at 1. That reconciliation was appropriate because Gross Revenues did not become "due" until well after those amounts were billed and because of the deferral of fees and advances under the terms of the Hi-5 Agreements. In response to that letter, EBSS and Belton (through counsel) again disputed the claimed amount due, arguing that EBSS and Belton had allegedly "paid more than the amounts listed in your attached statements for the period of February through October 2024." ECF No. 18-3.

Hi-5 ABA thereafter conducted an audit to reconcile the amounts EBSS and Belton owed and provided the results in a letter date June 13, 2025. ECF No. 18-4. In that letter, Hi-5 ABA noted that many of the payments made in February through June were for amounts billed or advanced months prior to those payments being made and that the amount due reflected amounts collected since that time. *See id.* at 1-2. Attached to that letter was a ledger, showing payments and credits that reflected the deferral of fees, advances, and credits against amount billed months before they were collected. *Id.* at 4-9. After receiving no further substantive response from EBSS or Belton, the Hi-5 Parties filed this action on July 11, 2025. ECF No. 1.

_____

prepared to cease operating and asked Hi-5 Processing to provide information about the amounts they owed, suggesting they intended to pay all amounts deferred that they would owe prior to ceasing operations. As an alternative to denial of the defendants' motion, the Hi-5 Parties are also moving for leave to amend the complaint to add these additional allegations, which would serve as the basis for an equitable estoppel defense to the defendants' position on the contractual limitations period.

## III.    ARGUMENT

### A.    Legal Standard

In ruling on a motion for judgment on the pleadings under Rule 12 (c), a court should grant such a motion "only when the pleadings, construing the facts in the light most favorable to the nonmoving party, (1) fail to state any cognizable claim for relief; and (2) the matter can be decided as a matter of law." *Pellegrino v. Equifax Info. Servs.*, LLC, 709 F. Supp. 3d 206, 211 (E.D. Va. 2024). As this Court has indicated

> Although in ruling on a motion under Rule 12(c), the court applies the standard for a Rule 12(b)(6) motion, unlike a Rule 12(b)(6) motion, courts consider the pleadings (the complaint, answer, and any written instruments attached to those filings) and any documents that are integral to the complaint and authentic.

*Id.* (cleaned up). "Like a Rule 12(b)(6) motion, a Rule 12(c) motion 'generally cannot reach the merits of an affirmative defense.'" *United States v. Google, LLC*, 692 F. Supp. 3d 583, 591 (E.D. Va. 2023) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc). Indeed, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged, the defense may be reached under Rule 12(c); however, this principle only applies if all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Id.* (cleaned up).

Under Virginia law,

> Contracts are construed as written, without adding terms that were not included by the parties. Where the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used. Furthermore, contracts must be considered as a whole without giving emphasis to isolated terms. Finally, no word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract.

*TM Delmarva Power, LLC v. NCP of Va., LLC*, 263 Va. 116, 557 S.E.2d 199, 200 (2002) (internal citations and quotation marks omitted).

      **B.**      **<u>Neither Hi-5 Processing nor ABC Agreed that Any Claims Must Be Brought within One Year.</u>**

As discussed above, there are three contracts at issue in this action. The Hi-5 Parties alleged that EBSS breached all three of those contracts by failing to pay amounts due under each of those contracts. ECF No. 1 ¶¶ 21, 23-24, 27, 31, 34, 36. However, the only agreement which contains any limitations period for commencing an action against the other is the Franchise Agreement between Hi-5 ABA and EBSS. ECF. No. 1-2 § 27.7. Despite acknowledging that the contractual limitations period was a provision of the Franchise Agreement (ECF No. 36-1 at 4), EBSS and Belton combine the Hi-5 Parties together in arguing that "[b]ecause Plaintiffs waited more than one year to file suit, their claims are barred under the contract they exclusively drafted." *Id.* at 2. But Hi-5 Processing and ABC were not parties to the Franchise Agreement. Nor were they third-party beneficiaries of that Agreement by its express terms. *Id.* § 26.3. And those plaintiffs' separate agreements with EBSS—the Services and Consultation Agreements—do not include any obligation on either party to those agreements to assert claims against EBSS or Belton within any particular time-period. *See* ECF Nos. 1-3 & 1-4.

Because neither Hi-5 Processing nor ABC agreed to a contractual limitations period in their contracts with EBSS and were not parties to the Franchise Agreement, they had no obligation to assert any their breach of contract claims under their separate agreements with EBSS at any time before the expiration of the five-year statute of limitations for actions on written contracts under Virginia law. Va. Code Ann. § 8.01-246(A)(2); *see also Bizmark, Inc. v. Indus. Gas & Supply Co.*, 358 F. Supp. 2d 518, 521 (W.D. Va. 2005) (holding that Virginia statute of limitation for actions to enforce the obligation of a party to pay a note was not

applicable to defendant because he was not a party to the note at issue and instead shorter limitations period for actions under the UCC should be applied); *cf. Allstate Ins. Co. v. Hague*, 449 U.S. 302, 329, 101 S. Ct. 633, 649, 66 L. Ed. 2d 521 (1981) ("While contracting parties may be able to provide in advance that a particular rule of law will govern disputes between them, their expectations are clearly entitled to less weight when the rights of third-party litigants are at issue."). Accordingly, there is no basis to enter judgment against Hi-5 Processing's and ABC's on their claims against EBSS.[10]

### C.    Hi-5 ABA Asserted Its Claims within One Year of When the Facts Giving Rise to Those Claims Occurred.

Under Section 18.5 of the Franchise Agreement, EBSS agreed (and Belton guaranteed) to pay all sums owing to Hi-5 ABA and its affiliates upon expiration of that Agreement. ECF No. 1-2 § 18.5. Hi-5 ABA has asserted a claim for breach of that provision of the Franchise Agreement because upon expiration of the Franchise Agreement, EBSS and Belton did not pay

---

[10] To the extent EBSS and Belton attempt to assert for the first time in any reply briefing that that Hi-5 Processing and ABC as non-signatories to the Franchise Agreement are estopped from avoiding the contractual limitations period in that Agreement, that argument (aside from being made too late) would also fail. First, Hi-5 Processing's claims arise out of EBSS's alleged breach of its payment obligations under the Services Agreement, not the Franchise Agreement, and ABC's claims arise out of EBSS's alleged breach of its payment obligations under the Consultation Agreement. In any event, the contractual limitations in the Franchise Agreement is tied to claims "brought by any party hereto against the other." ECF No. 1-2 § 27.7. That language by its terms obligates only the parties to the Franchise Agreement to assert claims within one year. Moreover, courts apply the theory of to permit a non-signatory to enforce an arbitration provision, forum selection clause, or pre-suit mediation requirement against a signatory. *See, e.g.*, *Reline America*, 2024 WL 4025840, at *4-5 (holding that signatory to agreement was estopped from claiming that non-signatories could not enforce requirement in contract that the signatory mediate prior to initiating legal action). The Fourth Circuit's decision in *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 163–64 (4th Cir. 2004) recognizes this distinction. In that case, the Court rejected a contractor's argument that a non-signatory homeowners' association was obligated to arbitrate its claims relating to construction issues under the arbitration provision in the construction contract between the contractor and the developer. *Id.* The Court held that the homeowners' association's claims did not arise out of the general contract but were based on common law legal duties separate from that contract. *Id.*

the amounts owed to the Hi-5 Parties (and which the parties had been attempting to reconcile since the Notice of Default), including amounts that became due after the Notice of Default was sent. ECF 1 ¶ 26-27, 29, 34-36. Because the Hi-5 Agreements expired on October 28, 2024, the facts giving rise to Hi-5 ABA's claim for breach of Section 18.5 of the Franchise Agreement did not occur until after October 28, 2024, when EBSS and Belton failed to comply with that provision of the Agreement. Accordingly, Hi-5 ABA's claims filed on July 11, 2025 were timely filed. *See, e.g.*, *Wilson v. Miller*, 104 Va. 446, 448, 51 S.E. 837, 838 (1905) ("As a general rule, when there is an undertaking or agency which requires a continuation of services, the statute of limitations does not begin to run until the termination of the undertaking or agency.").[11]

Moreover, as discussed above, EBSS's obligation to make payments during the term of the Franchise Agreement (and the other Hi-5 Agreements) was not as simple as applying a percentage to EBSS's monthly billings and EBSS cutting a check. Instead, the parties agreed that Hi-5 Processing would handle billing of the services EBSS provided to clients and monitor third-party approval for billed services and ultimate collection of payment for those services. But because the time between billing and collection could span months, the parties also agreed that payments due under the Hi-5 Agreements could be deferred for up to one year, or for longer periods if further deferred by Hi-5 ABA or Hi-Processing. ECF No. 1-2 §§ 4.4.6, 4.5.1.1; ECF No. 1-3 §§ 18, 20.[12] Thus, when Hi-5 ABA sent the Notice of Default on July 16, 2024, it was

---

[11] Although subsequent Virginia Supreme Court decisions have applied the "continuing undertaking" rule to ongoing relationships such as legal, medical, or accounting services, *see, e.g.*, *Harris v. K & K Ins. Agency, Inc.*, 249 Va. 157, 161, 453 S.E.2d 284, 286 (1995), the Hi-5 Parties were providing similar ongoing professional services as an agent of EBSS on a continuing basis.

[12] This process and course of dealing between the Hi-5 Parties and Hi-5 ABA franchisees like EBSS was also described in detail in the franchise disclosure document that Hi-5 ABA provided to all prospective franchisees (and which EBSS and Belton received prior to entering into the Hi-5 Agreements). Although that disclosure is not alleged in the Complaint, it is part of the

demanding EBSS pay amounts that had been deferred prior to June 2024, and to which it previously had not required or demanded EBSS to pay because of the deferral of those payments. As a result, those amounts were not "due" until after Hi-5 ABA notified EBSS that it was no longer deferring EBSS's obligation to pay those amounts and demanded payment by EBSS in the Notice of Default. Indeed, had those amounts already been "due" and not deferred, Hi-5 ABA could have simply withdrawn them from EBSS's bank accounts to which it had access prior to July 2024.

Instead, because EBSS had defaulted by ceasing to use the central billing system and removing Hi-5 Processing's access to EBSS's bank accounts for purposes of collecting amounts due to Hi-5 ABA, Hi-5 ABA elected at that time to end the deferral of payment of fees due under the Hi-5 Agreements. As a result, under the terms of the Franchise Agreement (and the other Hi-5 Agreements), the outstanding fees identified in the Notice of Default were "due" to be paid to Hi-5 ABA for the first time on July 16, 2024, when Hi-5 ABA ended the deferral of EBSS's obligation to pay those fees and demanded EBSS pay those amounts. In addition, Hi-5 ABA was also contractually obligated to afford EBSS at least thirty days to cure (i.e., to pay the amounts due),[13] which meant EBSS had until August 15, 2024 to pay the past due amounts. Thus, the facts that gave rise to Hi-5 ABA's claims for ongoing royalty payments due under the Franchise Agreement occurred no earlier than July 16, 2024 (and more accurately, after August 15, 2024, when EBSS failed to cure and pay the demanded amounts). Because Hi-5 ABA filed this action

---

allegations the Hi-5 Parties would include in their proposed First Amended Complaint. *See infra* Section II.E and Exhibit A ¶ 21.

[13] As noted above, that cure period could have been as much as sixty days under California law. *See supra* note 7.

within a year of making demand for the deferred amounts on July 16, 2024—i.e., on July 11, 2025—Hi-5 ABA's claims were timely under the Franchise Agreement.

**D.**      **There Are Material Factual Disputes That Preclude Judgment on the Pleadings on Hi-5 ABA's Claims.**

       **1.**      **The Defendants Mischaracterize the Accrual Date as a Single Date, as Opposed to Multiple Dates.**

The defendants contend that the Hi-5 Parties claims for breach all accrued "no later than June 2024, and almost certainly as early as February 2024." ECF No. 36-1 at 5. But that is an inaccurate statement of Virginia law on accrual of the types of claims asserted. "Under Virginia law, rights of action generally do not arise upon future periodic obligations until they are due, even though there has been a default in the performance of one of the earlier periodic obligations." *Wiglesworth v. Taylor*, 239 Va. 603, 607, 391 S.E.2d 299, 303 (1990); *see also Am. Inn, L.P. v. Wolf*, 28 F. App'x 316, 320-21 (4th Cir. 2002) (finding that "Virginia follows the general rule" that "a cause of action accrues, and the statute of limitations begins to run, when each installment comes due"); *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, Civ. Action No. 7:16-cv-00489, 2020 WL 929580, at *4-5 (W.D. Va. Feb. 26, 2020) ("The evidence shows that the contract came due in February of each year and the first breach, on July 1, 2010, did not cause all of the damage possible under the contract."); *Kancor Am., Inc. v. ATC Ingredients, Inc.*, Case No. 1:15-cv-00589-GBL-IDD, 2016 WL 740061, at *5-6 (E.D. Va. Feb. 25, 2016) (rejecting defendant's argument that claims of alleged breach occurred eight years before the lawsuit were time-barred because the "each breach constitutes a separate and distinct occurrence that gives rise to separate claims").

Under that authority, each instance on which EBSS failed to make a royalty payment due under the Franchise Agreement constituted a separate and distinct occurrence that gave rise to a separate claim for breach of that Agreement. Thus, contrary to the defendants' contention, Hi-5

ABA's claim for breach was not a single claim that accrued in June 2024 (or February 2024). Instead, a new claim of breach accrued (and a new limitations period began running) on each date when EBSS failed to pay an amount due under the Franchise Agreement.

### 2.    There Are Material Factual Disputes as to When Payments Were "Due."

The Hi-5 Parties have already explained that the overdue fees identified in the Notice of Default were previously deferred and not due until Hi-5 ABA demanded EBSS pay them in that Notice, while the defendants claim those amounts were due earlier; as such, there is a factual dispute as to when payments were "due" under the Franchise Agreement (and the other Hi-5 Agreements). Moreover, there is a dispute of material fact as to whether a portion of the total amount of royalties that Hi-5 ABA claims EBSS owed as of the date Hi-5 ABA filed the Complaint came due within one year of that filing due to the ongoing nature of collection of Gross Revenues and payments under the Franchise Agreement (and other Hi-5 Agreements). As discussed above, each instance in which EBSS failed to pay Hi-5 ABA royalties under the Franchise Agreement (or other amounts due under the other Hi-5 Agreements) "constitutes a separate and distinct occurrence that gives rise to separate claims." *Kancor Americas*, 2016 WL 740061, at *6. Because there are material facts in dispute about when those royalty payments were due based on when the Gross Revenues on which they were based were actually collected (and whether or not they were deferred), judgment on the pleadings is inappropriate.[14]

---

[14] As explained in the next section, to the extent the Court deems that the Complaint does not sufficiently allege such facts, the Hi-5 Parties should be granted leave to amend the Complaint to allege such facts.

**E.**     **If the Court Is Nevertheless Inclined to Issue Judgment on the Pleadings, the Hi-5 Parties Cross-Move for Leave to Amend the Complaint to Add Factual Allegations to Address the Defendants' Contractual Limitations Affirmative Defense.**

Under Fed. R. of Civ. P. 15(a)(2), "leave to amend a pleading should be freely given when justice so requires." *Edwards v. City of Goldsboro*, 178 F.3d 213, 242 (4th Cir. 1999) (holding district court abused its discretion by refusing to permit amendment of complaint). The Fourth Circuit has made clear that "[t]he law is well-settled that leave to amend pleading should be denied <u>only when</u> the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Id.* (emphasis in the original). Here, in the event the Court is inclined to grant the defendants' motion (which would be error as explained above), the Hi-5 Parties move in the alternative for leave to amend their complaint under Fed. R. Civ. P. 15 (a)(2) to make allegations to meet the defendants' affirmative defense; such amendment would not prejudice the defendants, there has been no bad faith by the Hi-5 Parties, and the amendment is not futile.

Consistent with Fed. R. Civ. P. 8(a), the Hi-5 Parties complaint contains "a short and plain statement of the claim[s] showing that the pleader is entitled to relief." In response, the defendants asserted an affirmative defense that the Hi-5 Parties' claims were barred by the contractual limitation provision in the Franchise Agreement (ECF No. 35 at 5 (First Affirmative Defense)) and, in the present motion, seek judgment on the pleadings based on that affirmative defense. However, "a plaintiff is not required to anticipate" affirmative defenses in pleading its claims. *Guy v. E.I. DuPont de Nemours & Co.*, 792 F.2d 457, 460 (4th Cir. 1986). Indeed, the Fourth Circuit has reversed the decision of a district court that granted a defendant's Rule 12(c) motion based on a statute of limitations affirmative defense rather than granting a plaintiff's motion for leave to amend to address that defense. *Id.* at 460-61 ("Under the circumstances

- 17 -

present in this case, where [the plaintiff] was not unduly dilatory in seeking such an amendment, we conclude that, pursuant to Fed. R. Civ. P. 15(a), he should have been permitted to amend his pleadings to meet the defense of limitations.").

Following the guidance of *Guy*, to the extent the Court is inclined to conclude that the Complaint and accompanying exhibits discussed above do not clearly establish that this action was timely filed, the Court should grant the Hi-5 Parties' leave to amend the Complaint to allege additional facts that, if proved, would establish that the Hi-5 Parties claims are not time-barred (or that there are disputed material facts that preclude judgment on the pleadings). To that end, a proposed First Amended Complaint is attached as Exhibit A to this Opposition and Cross-Motion.

Nor is there any basis to deny this motion (other than as moot if the Court denies the defendants' motion).

*First*, there will be no prejudice to the defendants from allowing amendment of the complaint. The case is in its early stages, with the Court yet to enter a scheduling order and the answer to the original complaint only having been filed two weeks ago. Moreover, the proposed amendment adds allegations regarding additional terms of the parties' agreements and details of their course of dealing under the terms of those agreements of which the defendants are already aware. Having to respond to those additional allegations (added only to clarify and meet the defendants' affirmative defense) would not prejudice the defendants in any way, as they are already obliged to defend against the claims against them.

*Second*, the Hi-5 Parties have not acted in bad faith. As the Fourth Circuit made clear in *Guy*, the Hi-5 Parties were not obliged to anticipate the defendants' assertion of an affirmative defense in crafting their original complaint. As such, it is not bad faith to seek the opportunity to

- 18 -

meet that defense with allegations of facts that refute the claim of untimeliness. Indeed, *Guy* suggests that is the proper outcome, far from bad faith.

*Third*, the amendment is not futile. As discussed above, there are multiple reasons why the Hi-5 Parties' claims are timely and not barred by the contractual limitation provision of the Franchise Agreement. The proposed amendments to the Complaint (see Exhibit A) elucidate the facts underlying those reasons to establish that either the defense fails or, at a minimum, there are material factual disputes as to whether the defense bars the Hi-5 Parties claims in whole or in part, if at all.

Accordingly, if the Court deems that judgment on the pleadings would be appropriate based on the allegations made in the original Complaint, the Court should grant the Hi-5 Parties leave to amend the Complaint to include additional factual allegations to meet the defendants' affirmative defense rather than entering judgment on the pleadings.

*            *            *            *            *

In sum, the Court should deny the defendants' motion.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the defendants' motion for judgment on the pleadings should be denied. Alternatively, as opposed to entering judgment on the pleadings, the Hi-5 Parties respectfully request that the Court grant them leave to amend the complaint to address the defendants' affirmative defense.

- 19 -

Respectfully submitted,

s/Benjamin B. Reed
Benjamin B. Reed
Virginia Bar No. 78190
breed@plavekoch.com
James C. Rubinger
Virginia Bar No. 20317
jrubinger@plavekoch.com

PLAVE KOCH PLC
3120 Farview Park Drive, Suite 240
Falls Church, Virginia  22042
703-774-1200 (phone)
703-774-1201 (fax)

*Attorneys for Plaintiffs Hi-5 ABA, Inc., Hi-5 ABA Processing, Inc., and ABC Behavior, a division of Cornerstone Missions, Inc.*

April 10, 2026